THE STATE v. EARL NICHOLS, Appellant.—39 S. W. (2d) 777.

Division Two, June 5, 1931.

*Hammett & Holman* for appellant.

*Stratton Shartel,* Attorney-General, and *A. B. Lovan,* Assistant Attorney-General, for respondent.

HENWOOD, J.—By an information filed in the Circuit Court of Randolph County, at Huntsville, it is charged that, on or about June 21, 1929, the defendant did unlawfully and feloniously manufacture "hootch, moonshine, corn whiskey." The case was transferred to the Circuit Court of Randolph County, at Moberly, where the defendant was tried, found guilty "as charged," and his punishment assessed, by the jury, at imprisonment in the peni-

tentiary for two years. He was sentenced accordingly, and appealed.

The evidence adduced by the State is substantially as follows:

On June 21, 1929, the Sheriff of Randolph County and two deputies went to the defendant's home, about seven miles south of Moberly, in Randolph County, with a search warrant. They met the defendant's brother at the gate, and he told them the defendant was eating dinner. "Someone come to the door and said: 'Mr. Nichols is eating dinner and is coming right out.'" About that time, one of the sheriff's deputies saw a man in a "suspicious position" behind a door, inside of the house, "stooping over as if he was pouring something out," and the deputy said to the sheriff, "I believe somebody is pouring out some stuff." When the defendant came out of the house, the sheriff handed the search warrant to him, and told him he came there "for a raid, looking for liquor." The sheriff and his deputies then proceeded to search the house and several outbuildings on the defendant's premises. They found no liquor, but, at the place in the house where a man had been seen "stooping over as if he was pouring something out." they found a hole in the floor, about three and a half inches wide and one foot long, with a wet spot around it, and they detected the odor of "hootch, moonshine and corn whiskey" at the hole. In a granary, they found a ten-gallon boiler, a heater with two burners, a pressure gas tank, two fifty-gallon barrels of mash, a tub of water, an empty tub, and a rubber tube. The boiler was resting on a stand, over the heater, and the two burners of the heater were connected with the pressure gas tank. The boiler was "damp inside and smelled like corn whiskey, hootch and moonshine," and the bottom of the boiler was "black with soot." On the lid of the boiler, there was a cap, with an opening in it, fastened "down tight" with thumb screws, and there was an extension on the cap "for the attachment of the coil." One of the barrels was full of mash, and the other barrel "had some in it—not very much." The mash was composed of "corn chop and wheat and water," and "it was in a fermenting state." During the progress of the search, the defendant told the sheriff "he had this still," and "where it was at." He "wanted" the sheriff to "overlook him and let him go." In this conversation, the defendant said: "If you will let me go, I will not make any more corn liquor. I have been caught once. What will you take to let me go?" The sheriff told him he "couldn't do nothing like that."

The foregoing statement of the State's evidence is taken from the testimony of the sheriff and his deputies. Each of them testified that he was familiar with the odor of moonshine whiskey. One of the deputies testified that hootch and moonshine may be made out of

corn; or corn and wheat mixed, or peaches, or rye; and that, when hootch or moonshine is made out of corn, or corn and wheat mixed, it is corn whiskey. The boiler, heater, pressure gas tank, rubber tube, and a jug of mash, taken from one of the barrels, were produced at the trial, admitted in evidence, and exhibited before the jury.

The defendant testified: He had lived in Randolph County eighteen or nineteen years, and five years on the farm where the search was made. The boiler had been in his possession about four or five years, and the heater and pressure gas tank about five or six years. He found the boiler "in the woods on Press Oliver's place," and "just took it." Press Oliver was a colored man, and one of his neighbors. He bought the heater and pressure gas tank from "Mr. White," a representative of the "new soda-pop works." One of the old burners on the heater "wouldn't burn," and he bought a new burner at Murphy's hardware store in Higbee. He had never had a worm or coil "to fit on this boiler," and had never made any hootch, moonshine or corn whiskey "with this still." The mash found by the officers was made of "just wheat," and had been "soaking" only three days. "It had not been on long enough to be boiled out." He had been using the tubs in the granary in "mixing feed," for his hogs, out of "another barrel of mash." There was a hole in the floor of his house, but no liquor was poured "down the hole" the day of the search. He "never named whiskey" in his conversation with the sheriff the day of the search. He pleaded guilty, on November 18, 1927, "to having possession of a still," and served a jail sentence "for it." When cross-examined as to his conversation with the sheriff on the day of the search, he said: "I just told him I thought he ought not to arrest me; that he had not found anything." When asked whether or not he told the sheriff he "would not do it again" if the sheriff would let him "go," he said: "I don't recollect whether I did or not—I wouldn't say for sure what I said to him."

Mark Murphy testified, on behalf of the defendant, that he was engaged in the hardware business in Higbee, and that the defendant bought a "generator burner" from him sometime in June, 1929.

I. It is contended that the trial court erred in permitting the prosecuting attorney to amend the affidavit to the information during the trial, and in denying the defendant's request for a postponement of the trial after such amendment had been made.

In this connection, the record shows the following proceedings: When the prosecuting attorney began the examination of the first witness for the State, the defendant objected to the introduction of any evidence,

on the ground that the information was defective, "because the filing mark on the information shows it was filed (June 24, 1929) a month before it was sworn to (July 24, 1929)." Thereupon, the prosecuting attorney stated that "the record of the clerk shows it was sworn to on the day it was filed," and asked, and was granted, leave to change the date of the affidavit from July 24, 1929, to June 24, 1929. When this amendment was made, the defendant filed an affidavit of surprise, in which he stated that he had relied on the insufficiency of the information as a complete defense, and asked that the trial be postponed for the purpose of allowing him "sufficient time" for the preparation of his defense on the merits. The prosecuting attorney then asked, and was granted, leave to verify the information *instanter*. When this was done, the defendant's request for a postponement of the trial was denied, and the trial proceeded.

The Statute of Jeofails says that, in all prosecutions by information, "any affidavit or information may be amended in matter of form or substance at any time by leave of court before the trial, and *on the trial as to all matters of form and variance*, at the discretion of the court, when the same can be done without prejudice to the substantial rights of the defendant, on the merits, and *no amendment shall cause any delay of the trial*, except at the instance of the defendant for good cause shown by affidavit." [Sec. 3508, R. S. 1929.] (Italics ours.)

The defendant was apprised of the nature and cause of the accusation against him on June 24, 1929, when the information was filed. On October 18, 1929, the day set for the trial, he answered ready for trial without challenging the sufficiency of the information by a motion to quash or otherwise. He attacked the information for the first time after the jury had been selected and sworn to try the case, and after the prosecuting attorney had begun to offer evidence on behalf of the State. Under such circumstances, the trial court did not abuse its discretion in permitting the prosecuting attorney to amend the affidavit to the information during the trial, or in denying the defendant's request for a postponement of the trial after such amendment had been made. [State v. McCray, 74 Mo. 303; State v. Brown, 181 Mo. 192, 79 S. W. 1111, and cases cited.]

II. It is further contended that "there is no substantial evidence to show that defendant had made any liquor whatever." True, the officers found no hootch, moonshine or corn whiskey when they searched the defendant's premises. But, they did find all equipment necessary for the manufacture of such liquor, except a coil, connected up and in working order, and more than fifty gallons of the kind of mash used in the manufacture of such liquor. The boiler was "damp inside and

smelled like corn whiskey, hootch and moonshine," and the bottom of the boiler was "black with soot," indicating recent use of the boiler in the manufacture of such liquor. At the place in the defendant's house where a man had been seen, shortly before, "in a suspicious position," stooping over as if he was pouring something out," they found a hole in the floor, with a wet spot around the hole, and detected the odor of "hootch, moonshine and corn whiskey" at and around the hole. Before the still and the mash were found, the defendant told the sheriff "he had this still," and "where it was at." He also said to the sheriff, "if you will let me go, I will not make any more corn liquor." From these and other facts and circumstances shown by the evidence, the jury were warranted in drawing the inference that the defendant had manufactured hootch, moonshine or corn whiskey within three years next before June 24, 1929, the date of the filing of the information. Therefore, we hold that the evidence is sufficient to support the verdict. [State v. Crabtree (Mo. Sup.), 12 S. W. (2d) 25; State v. Dailey (Mo. Sup.), 280 S. W. 1044; State v. Thogmartin (Mo. Sup.), 270 S. W. 313.]

III. The defendant now complains of numbered instructions 1 and 2, but he made no such complaint in his motion for a new trial, and, for that reason, the complaints now made concerning said instructions will be disregarded. [Sec. 3735, R. S. 1929; State v. Standifer, 316 Mo. 49, 289 S. W. 856.]

IV. Finally, it is contended that the prosecuting attorney made prejudicial remarks in his closing argument to the jury, and that, "on account of" said remarks, the jury should have been discharged.

The remarks complained of, the objections thereto, and the rulings on said objections, are as follows:

"MR. WALDEN: . . . I don't believe any man who ever manufactured whiskey thought he was going to the penitentiary for it. If you give him a fine he is getting just what he bargained for—he thought that would be the worst he would get. But, gentlemen of the jury, if you send him to the penitentiary, you have done something to stop this traffic in Randolph County—you have upheld the law, you make certain, gentlemen of the jury, *the safety of the boys and girls in Randolph County—*

"MR. HAMMETT (interrupting): We object and ask the court to reprimand the prosecuting attorney.

"THE COURT: Overruled. *Stay within the record, Mr. Walden.*

"And to the action of the court in so ruling the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions.

"Mr. Walden: I am trying to, your Honor. This is not a crime of passion committed in the heat of blood—a man is not compelled to do it by overwhelming force. I submit to you, from the quantity of mash on hand, it is a fair deduction that he was in it on a commerical scale—he was intending to make money, and he does not deserve sympathy when he comes before you. The man who manufactures whiskey is the head of the whole thing. If no man manufactures whiskey then no man can sell whiskey; if no man manufactures whiskey, it won't be transported—it won't be sold across the bar.

"Mr. Hammett: We object to that argument; it prejudices the jury; it is not arguing the evidence; he is arguing on the enforcement of the law.

"The Court: Objection overruled to the previous statement.

"And to the action of the court in so ruling the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions.

"Mr. Walden: It reaches down into every community.

"Mr. Hammett: We object to that for the same reason. The whole purpose is to prejudice the jury as to the evil effect of selling liquor and the liquor business.

"The Court: I don't gather the last statement.

"Mr. Walden: I am simply making the argument that if you stop the manufacture you stop the dealing. I think I have the right to argue that on the punishment.

"The Court: Overruled.

"And to the action of the court in so ruling the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions.

"Mr. Walden: If you stop the manufacture you stop other violations, because, if it is not manufactured, other violations cannot take place.

"Mr. Hammett: We ask that the jury be discharged. We think this argument is improper. He is arguing the evil effects of the liquor traffic, not only the making of it but the transporting of it, and its tendency is to prejudice the jury, and we ask that the jury be discharged.

"The Court: Overruled.

"And to the action of the court in so ruling the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions.

"Mr. Walden: Of course, if you don't believe that this man manufactured, don't convict him. He couldn't be convicted if he didn't manufacture; but he has made the issue, and the sole issue is whether he manufactured it. If he did manufacture it, then

assess punishment in this case that will be a lesson to other men who may want to manufacture—assess a punishment that will make any man who runs may read; *assess a punishment that will make your highway safe*—

"MR. HAMMETT: We object and again ask the jury be discharged.

"THE COURT: *I will sustain objection to the argument.* Your time is up, Mr. Walden." (Italics ours.)

Whether or not remarks of counsel are improper or prejudicial, and whether or not improper or prejudicial remarks necessitate a reprimand of counsel or a discharge of the jury, are matters which rest largely in the discretion of the trial court, and we find no abuse of that discretion in this case. The defendant's chief objection to the remarks in question was that such remarks related to "the enforcement of the law." We have held that the prosecutor has the right to urge the jury to uphold the law, and to draw proper inferences as to the effect of the failure of the jury to uphold the law. [State v. Marshall, 317 Mo. 413, 297 S. W. 63; State v. Lynn, 23 S. W. (2d) 139.] It may be conceded that, in this instance, the prosecutor went too far when he referred to "the safety of the boys and girls in Randolph County," and also when he said to the jury, "assess a punishment that will make your highway safe." However, the court cautioned him to "stay within the record" when he made the former statement, and sustained the defendant's objection to the latter statement. Considering this action on the part of the trial court, and the evidence in the case, we do not think the defendant was harmed by these statements of the prosecutor. Certainly we do not agree with the defendant in the contention that the jury should have been discharged "on account of" these statements. [State v. Marshall, supra; State v. Lynn, supra.]

No reversible error appears in the record proper or in any of the trial proceedings which have been preserved for our review.

The judgment is accordingly affirmed. All concur.