**STATE of Missouri, Respondent,**

**v.**

**James Arlan KAYS, Appellant.**

**No. 57483.**

Supreme Court of Missouri, Division No. 1.

April 9, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

J. A. Appelquist Law Offices, J. A. Appelquist, Robert L. Bruer, Samuel C. Jones, Springfield, and Mt. Vernon, for appellant.

HIGGINS, Commissioner.

James Arlan Kays, charged with manslaughter by culpable negligence "while in an intoxicated condition," in operation of a motor vehicle, was convicted by a jury which assessed his punishment at imprisonment for one year in the county jail and a fine of $1,000. Sentence and judgment were rendered accordingly. §§ 559.070, 559.140, RSMo 1969, V.A.M.S. (Appeal taken prior to January 1, 1972.)

The following is quoted from the statement in appellant's brief:

"Three motor vehicles figured in the two collisions: a blue 1969 Chevrolet 2½ ton truck, overall length 32 ft. owned by Bacon Tire Company, Republic, Mo., being operated by appellant. A 1966 Oldsmobile station wagon ambulance being operated by Mr. Alonzo Dean, 19. A green 1970 Ford Ranchero being operated by decedent Gamel. Paint samples taken from the Gamel Ford Ranchero indicated contact with the Bacon Chevrolet truck. The second collision was observed by * * * Charles Smith and involved the Bacon Truck and the ambulance and occurred within the intersection.

"The collisions occurred at the intersection of U.S. 65, and 'M' Highways, which intersection is located within the City Limits of Springfield, Missouri; U.S. 65 was a four-lane concrete North-South Highway with left-turn lanes, having dual southbound lanes and dual northbound lanes; 'M' Highway was a two-lane east and west blacktop highway intersecting U.S. 65. The intersection was a controlled intersection having a 'yield' sign for the left turning westbound traffic (appellant). For southbound traffic (decedent Gamel) there were two amber overhead caution blinker lights * * *; all blinker caution lights were operating. The posted speed limit was 55 mph. * * *

"Appellant Kays was operating his employer's 1969 Chevrolet truck which was partly loaded with tires returning from an Arkansas sales route having approached the intersection from the south and was en route home to Republic, Missouri, westbound * * *. The decedent Gamel was en route to Ozark, Missouri, southbound on U.S. 65; Alonzo Dean was en route to Branson, Mo., and southbound on U.S. 65. * * *

" * * * The ambulance driver Dean was seriously injured and testified that he has no recollection of the collision. Mr. Gamel the driver of the Ranchero sustained fatal injuries. * * *

"Appellant Kays was not injured seriously, however complained of pain involving his head and leg. One witness related he seemed in shock. Appellant assisted and remained at the accident scene for over an hour without restraint, and at request he willingly accompanied an officer to the City Police Station for the purpose of taking the Breathalyzer Test.

"There was no complaint of prior erratic driving or excessive speed on the part of the appellant.

" * * * Two officers at the scene considered appellant intoxicated, Bob Dean and Marvin Woods. Two officers at the scene had no opinion, Gary Dishman and Harold Brandwein. Three witnesses that arrived at the scene within five minutes after collision testified that appellant was not intoxicated; Charles O. Smith, Willis Greek, and Truman Harmon. * * *

"Appellant took the Breathalyzer test at 11:17 p. m. at the Police Station. He was reported as being cooperative but complaining of his hip and leg. A Breathalyzer machine test reading indicated .21/100,

which test reading was offered and admitted into evidence over objection. * * *

"Raymond Hargrave, Sergeant Springfield Police Department, testified that he held a type III permit to operate a Breathalyzer machine to administer breathalyzer tests; that he is not a qualified chemist and cannot analyze the chemical content of the reading; that he administered such a test to the appellant at 11:17 p. m., 4/15/71; that the results of the test was a reading of .21/100; that this was a reading of blood alcohol by volume; and that it was his opinion that the appellant was intoxicated. That appellant was not staggering. That on 9/14/71 witness made an experimental Breathalyzer test for attorney Bruer, which resulted in the same machine rendering an inaccurate test reading from the experiment, which witness attributed to a malfunction on his part regarding procedure.

"The jailer Stuart also gave a somewhat qualified observation that he believed that appellant was intoxicated.

"After the Breathalyzer test the appellant was handed two citations at the police station by Officer Dean, one being a charge of driving while intoxicated, and the second, drunk while on the public street. Appellant was released under bond to his employer, Mr. Bacon.

"Appellant's employer Mr. Bacon saw appellant at scene and was of the opinion appellant was not intoxicated and testified to appellant's trustworthiness and good character. * * *

"Richard A. Williams testified that at about 9:20 p. m. on the date of the accident he was on duty at the service station about 50 yards from the intersection when he heard a crash which caused him to look toward the intersection where he saw the Ranchero traveling through the air about five feet off the ground for a distance of approximately fifty feet. He testified that there have been 'quite a few' accidents at the intersection.

"Charles O. Smith, manufacturing engineer, Springfield, Mo., testified that he was a passenger in a car being driven by his son, which was southbound in the left or inside lane on Glenstone Avenue immediately prior to the accident; that at the second intersection north of the scene, an ambulance passed them between that intersection and the accident scene; that the Ranchero overtook the Smith car which was traveling at a rate of approximately fifty mph some distance north of the scene, blinked its lights twice as it approached from the rear; then passing the Smith car on the right pulling away at a speed of from fifty-five to sixty miles per hour; that at which time he commented to his son 'I wonder what's wrong with him'; that about one quarter mile from the scene he observed a 'shower of sparks' from the vicinity of inside lane near the scene although he did not see a collision between the Ranchero and the tire truck; that he arrived at the scene roughly half a minute later; that about five minutes after the accident he talked with the appellant; that he observed no indication of intoxication on the part of the appellant. That appellant was wearing a shirt and trousers and had an all-weather type of jacket * *. *.

"Keith Smith, age 18, student, * * * was driving the family car accompanied by his father, Charles Smith, on Glenstone Avenue when he stopped at an intersection beside an ambulance; later, proceeding on Glenstone at a speed of forty-five to fifty miles per hour, the ambulance pulled away ahead of him; that the Ranchero overtook him at a speed of fifty-five miles per hour 'or a little faster,' passing the Smith vehicle on the right. He did not observe a collision between the Ranchero and the truck however did observe a shower of sparks at the intersection.

"Kenneth Pemberton testified that he is a traffic engineer with the State Highway Department; that there was a flashing amber signal facing traffic southbound on Highway 65 at the scene; that a 'yield' sign was positioned on the east side of the

southbound lanes for northbound-left turning traffic at the intersection; that the scene is 'a high accident location,' there having been 28 accidents from March, 1969, to March, 1970, and 25 accidents from March, 1970, to March, 1971.

"Bob Dean testified that he is a member of the Traffic Department, Springfield Police Dept.; that the speed limit for southbound traffic at the scene was fifty-five miles per hour; that there were two blinking caution lights for southbound traffic at the scene; that he received a call to the scene at 9:33 P.M., arriving approximately five minutes later; that he spoke with the appellant at the scene; that the appellant stated to witness at the scene that 'I stopped but they didn't stop'; that it was his opinion that the appellant was intoxicated; and that appellant agreed to submit to a Breathalyzer Test; that after the test he gave the appellant a municipal court summons for being drunk on a public street and one for driving while intoxicated at the City Police Station at 10:45 P.M. or 11:00 P.M.; that he had no complaint regarding appellant's driving. That the clothing worn by appellant on the night of the collision included a shirt, trousers and jacket. * * *

"Marvin L. Woods testified that he was an officer of the Springfield Police Department on the date of the accident; that he was the first officer to arrive at the scene; that he conversed with the appellant at the scene and later drove him to the police station; that the appellant seemed to be dazed; that the appellant was complaining of a leg injury; and that he formed the opinion appellant was intoxicated, but was surprised at the high Breathalyzer reading.

"Truman Harmon, president of International Tool and Die, Springfield, Mo., testified that he lives about two hundred feet from the scene; that he heard 2 crashes; that he reached the scene in five minutes or less after the collisions; that when he arrived at the scene he wrenched open the door of the tire truck; that he inquired if the appellant was injured; that appellant indicated his head and leg injured; that appellant appeared to be stunned or dazed; that the appellant was observed by witness assisting at the scene trying to aid the ambulance driver; that he spent several minutes in the vicinity of the appellant; that he observed appellant limping; that appellant gave no indication of being intoxicated; that he had 10 years law enforcement experience.

"Willis Richard Greek, age 28, married, college student SMS, Springfield, Missouri, testified that he arrived at the scene within five minutes of the accident; that the appellant was exiting the tire truck when he arrived at the scene; that he observed the appellant throughout the evening; that he talked to the appellant; that he observed no indications of intoxication on the part of the appellant; that appellant appeared in a state of shock.

"Fay Bacon testified that he is the owner of the Bacon Tire Company; that his company owned the 1969 Chevrolet truck; that he is appellant's employer; * * * that he arrived at the scene at approximately 10:00 p. m.; that he conferred with the appellant for ten to fifteen minutes at the scene; that the appellant did not appear to be intoxicated; that the appellant's leg appeared to be injured and that the appellant walked with a limp. * * * That he followed the wrecker and truck to Republic and thereafter returned to Springfield and obtained release of appellant at the City Police Station.

"Appellant's good character was attested to by Mr. William Schatz, Superintendent of Schools, Republic, Mo.; Mr. Lester T. Sweckard, Mayor and Office Manager of the Empire District Electric Company, Republic, Mo.; and Mr. Ray Matthews, Greene County Deputy Sheriff and Chief of Police, Republic, Mo."

Respondent's brief adopts the foregoing statement and adds:

" * * * that defendant's truck was of a maximum size of thirty-two feet, loaded with tires; that the gross weight of the truck and tires was eleven and one-half tons; * * * that defendant had familiarity with the intersection, in fact he traveled it once a week. Defendant's witness, Fay Bacon, his employer, testified that defendant admitted drinking some beer the afternoon of the accident against company regulations. Officer Dean, in addition to testifying as to defendant being intoxicated observed an empty beer can in the cab of the truck. Officer Hargrave testified that defendant appeared to be unsteady, with glassy eyes, having the odor of alcohol on his breath and that he felt he was intoxicated. Bobby Joe Hessee, the ambulance driver who was called to the scene, testified as to a slur in defendant's speech, his glassy eyes and that he felt defendant was intoxicated."

In addition, photographs in evidence show: that the major damage to the truck was to its front, particularly its right front and corner; that the damage to the ambulance was to its left side, particularly in the area of the driver, with it and the truck locked together by the impact and the ambulance driver fastened in the wreckage of the ambulance; that the ambulance came to rest with its right-hand side parallel to and hard by the grassy shoulder on the west side of the southbound lanes of Highway 65; that the damage to the Ranchero extended along its entire left side, a total loss, and that it came to rest in the ditch to the south of Highway M and to the west of the southbound lanes of Highway 65.

Appellant challenges the sufficiency of this evidence. He contends he should have received a judgment of acquittal at the close of all the evidence "as there was no substantial evidence whereby the jury could have found * * * an indication of reckless and utter disregard and indif-

ference for human life, or reckless disregard for consequences from which a criminal intent might be inferred, thereby amounting to culpable negligence," from which to convict appellant of manslaughter.

Appellant concedes the presence of evidence to show a collision between the truck he was driving and the Ranchero driven by deceased. He argues, however, "there is no substantial evidence to establish a criminal agency indicating that appellant's driving was motivated by a reckless and utter disregard and indifference for human life or limb" to prove culpable negligence so as to fix criminal responsibility within the meaning of the statute. State v. Achter, 445 S.W.2d 318 (Mo.1969); State v. Duncan, 316 S.W.2d 613, 615 [3] (Mo.1958). He further states his position as a belief that the record "indicates that the collision in question was accidental, through a combination of fortuitous circumstances, not the least of which was decedent's speed in approaching the caution marked intersection." He also asserts a lack of evidence of "driving misconduct on the part of appellant prior to the subject collision * * *. Hence no fact on which to base a finding that appellant had an utter disregard and indifference for human life at or prior to the collision involving decedent Gamel."

Appellant reminds that in this review "the scintilla doctrine does not prevail. * * * ' "The evidence must be of a character sufficiently substantial, in view of all the circumstances of the case, to warrant the jury, as triers of the facts, in finding from it the fact to establish which the evidence was introduced." * * * In other words, substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.'" State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 51–52 (1936). He also cites State v. Rogers, 380 S.W.2d 398 (Mo.1964), that circumstantial evidence which showed merely an opportunity to commit the crime and created merely a

strong suspicion of guilt without more is not sufficient to support conviction; and State v. Simler, 350 Mo. 646, 167 S.W.2d 376, 382 [3, 4] (1943), that a defendant cannot be convicted of manslaughter "merely because he had been drinking; nor by an application of the doctrine of res ipsa loquitur."

To these standards should be added the "well established rule that by reason of the jury's findings of guilt, the prosecution (respondent) is entitled to the benefit of all reasonable inferences from the evidence and that any conflicts in the evidence are to be resolved in favor of the jury verdict." United States v. May, 419 F.2d 553, 555 [3] (8th Cir. 1969). See also State v. Burton, 357 S.W.2d 927, 930 [2] (Mo.1962), that circumstantial evidence tending to support the verdict must be considered as true, and every legitimate inference favorable to the verdict must be indulged; and although drinking will not, of itself, support a manslaughter conviction, it is properly considered with other evidence on the issue of culpable negligence, State v. Carter, 451 S.W.2d 340, 344 [3] (Mo.1970).

From the evidence and under these standards, a jury reasonably could infer that defendant had been drinking at the time of his collision with decedent, and to the extent of statutory intoxication when his breath specimen was taken and analyzed; that he was familiar with the character of the intersection where the collision occurred; that it was nighttime; that despite his duty to look out for and to yield to southbound traffic, such as decedent, he failed to appreciate the danger of collision and personal injury and drove a two-and-a-half-ton heavily-loaded truck into the southbound traffic lanes and into collision with decedent; that the collision was one of great impact; and that defendant's actions in these circumstances were wanton, culpably negligent conduct which caused the collision and death. Submissible cases of manslaughter by motor vehicle have

been found in similar situations, e. g.: State v. Carter, supra, defendant drinking, speeding, passing on a blind hill, and colliding with approaching motorist; State v. Achter, supra, defendant drinking, racing, driving into read-end collision, and leaving accident scene; State v. Hughey, 404 S.W.2d 725 (Mo.1966), defendant drinking, speeding, and, after striking deceased, left scene; State v. Duncan, supra, defendant under influence of intoxicants, driving too fast for conditions on wrong side of road, and into collision with approaching motorist; State v. Adams, 359 Mo. 845, 224 S.W.2d 54 (1949), defendant intoxicated, ran stop sign and into intersection collision; State v. Burchett, 302 S.W.2d 9 (Mo.1957), defendant drinking, passed on a hill and collided with approaching motorist; State v. Pennick, 364 S.W.2d 556 (Mo.1963), defendant drinking, speeding, weaving, and driving across center line on viaduct and into collision; State v. Millin, 318 Mo. 553, 300 S.W. 694 (1927), defendant, while intoxicated and speeding, struck pedestrian; State v. Feger, 340 S.W.2d 716 (Mo.1960), defendant drinking and speeding after dark; State v. Horner, 266 Mo. 109, 180 S.W. 873 ·(1915), defendant driving in excess of speed limit and, without warning, struck decedent; State v. Daugherty, 320 S.W.2d 586 (Mo.1959), defendant drinking, speeding, and failed to stop at stop sign; State v. Murphy, 324 Mo. 183, 23 S.W.2d 136 (1929), defendant intoxicated, speeding, and without swerving, struck a pedestrian.

Appellant contends he should have been discharged for the further reason that Section 559.070 RSMo 1959, "manslaughter" is "vague, obscure, indefinite, and uncertain, and provides no definition of culpable negligence in that it does not specify the conduct which is prohibited, for all of which it is unconstitutional."

Section 559.070 provides: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable

or justifiable homicide shall be deemed manslaughter."

The gist of appellant's argument is that the statute provides no definition of "culpable negligence," and thus an ordinary person is unable to ascertain what particular act is condemned.

As suggested by appellant, "The standards for determining the constitutional sufficiency of a statute against an attack on the ground of vagueness are quite well established. The general rule is that a statute creating and defining a criminal offense 'must be sufficiently explicit, in its description of the acts, conduct or conditions required or forbidden, to prescribe the elements of the offense with reasonable certainty, fix an ascertainable standard of guilt, and make known to those to whom it is addressed what conduct on their part will render them liable for its penalties, and not be so vague that men of common intelligence must necessarily guess at its meaning, and differ as to its application.' * * * The cases generally hold that if the words or terms used in a statute are of common usage and understandable by persons of ordinary intelligence they will satisfy the constitutional requirement as to definiteness and certainty." State ex rel. Eagleton v. McQueen, 378 S.W.2d 449, 453 [3, 4] (Mo. banc 1964). See also Ex parte Taft, 284 Mo. 531, 225 S.W. 457, 461 (Banc 1920); Missouri Pacific Railroad Co. v. Morris, 345 S.W.2d 52, 57 (Mo. banc 1961); State ex rel. Crow v. West Side St. Ry. Co., 146 Mo. 155, 47 S.W. 959, 961 (1898); Diemer v. Weiss, 343 Mo. 626, 122 S.W.2d 922, 923 (Banc 1938); State v. Carter, 475 S.W.2d 85, 90 [2, 3] (Mo. 1972); State v. Becker, 364 Mo. 1079, 272 S.W.2d 283 (1954). Appellant urges also that simply spelling out the elements of an offense in the indictment would not cure a vague statute, Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); that in order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal, Tozer v. United States, 52 F. 917 (8th Cir.

1892); and that criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable, People v. Chas. E. Austin, Inc., 301 Mich. 456, 3 N. W.2d 841 (1942); United States v. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

Appellant's argument likens culpable negligence as used in Section 559.070 to statutes or directives using reasonable or unreasonable and, accordingly, that such language should be held vague. However, it is only when the words reasonable or unreasonable are coupled with other vaguely or undefined commands that the use becomes subject to successful attack for vagueness, e. g., "willful and wanton disregard," Ex parte De La Pena, 157 Cr. 560, 251 S.W.2d 890 (Tex.1952); "negligent manner," State v. Pigge, 79 Id. 529, 322 P. 2d 703 (1957); "reasonable effort," Ex parte Taft, supra; and "unreasonable charging," Tozer v. United States, supra.

The dictionary has given historical meaning to "culpable" as well as to show it coupled with "negligence," as does Section 559.070, e. g.: "culpable * * * 1 obs: guilty, criminal 2: meriting condemnation or censure esp. as criminal * * * (homicides) or as conducive to accident, loss or disaster (negligence) * * *." Webster's Third New International Dictionary.

Similarly, case law has, over many years, consistently stated an ascertainable standard of conduct to constitute manslaughter by culpable negligence, e. g.: In State v. Murphy, supra, 23 S.W.2d 1. c. 138 [4], culpable negligence was defined by instruction as " 'the omission on the part of one person to do some act under given circumstances which an ordinarily careful and prudent person would do under like circumstances, showing on the part of such person a careless or reckless disregard for human life or limb, or the doing of some act under given circumstances which an ordinarily careful and prudent person under like circumstances would not do, showing on the part of such person a careless

or reckless disregard for human life or limb, by reason of which omission or action another person is directly endangered in life or bodily safety.' " This standard was further delineated by the explanation in State v. Studebaker, 334 Mo. 471, 66 S.W.2d 877, 881 [2] (1933): "In the zone between these two extremes—misadventure or mere civil liability, on the one hand, and carelessness so gross and wanton as to import malice, on the other, the killing of a human being by culpable negligence is manslaughter. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the slayer tended to endanger life." See also People v. Angelo, 246 N.Y. 451, 159 N.E. 394, 396–397 (1927): " 'Culpable' negligence is therefore something more than the slight negligence necessary to support a civil action for damages. It means disregard of the consequences which may ensue from the act, and indifference to the rights of others. No clearer definition, applicable to the hundreds of varying circumstances that may arise, can be given. Under a given state of facts, whether negligence is culpable is a question of judgment. Ordinarily for the judgment of the jury * * *. However indefinite the rule, however uncertain the meaning of such words as 'gross,' 'wanton,' 'reckless,' 'slight,' yet in view of the facts of a particular case, both the rule and the words do convey an idea to the jury sufficient to guide their action."

■ These, and definitions of similar substance, have been approved on many occasions, indicating establishment of an acceptable, definite and ascertainable standard of conduct, the violation of which renders one guilty of manslaughter by culpable negligence under the statute. See, e. g., State v. Melton, 326 Mo. 962, 33 S.W.2d 894 (1930); State v. Whipkey, 361 Mo. 1008, 238 S.W.2d 374 ·(1951); State v. Shriver, 275 S.W.2d 304 (Mo.1955); State v. Ruffin, 344 Mo. 301, 126 S.W.2d 218 (1939); State v. Carter, 342 Mo. 439, 116 S.W.2d 21 (1938); State v. Duncan, 316

S.W.2d 613 (Mo.1968); Reed v. Madden, 87 F.2d 846 (8th Cir. 1937). Similar statements and applications in denial of constitutional attacks for vagueness have been made in other jurisdictions, e. g., State v. Bolsinger, 221 Minn. 154, 21 N.W.2d 480 (1946); State v. Wendler, 83 Idaho 213, 360 P.2d 697 (1961); Smith v. State, 197 Miss. 802, 20 So.2d 701 (1945); State v. Wojahn, 204 Ore. 84, 282 P.2d 675 (1955); People v. Garman, 411 Ill. 279, 103 N.E.2d 636 (1952); Usary v. State, 172 Tenn. 305, 112 S.W.2d 7 (1938); Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); and see the distinction of State v. Pigge, supra, cited by appellant, in State v. Aims, 80 Idaho 146, 326 P.2d 998 (1958).

Accordingly, Section 559.070, in its use of "culpable negligence," is sufficiently definite and certain to create an ascertainable standard of conduct for common understanding.

In submitting this case the court gave Instruction 13 on the effect of a finding of alcohol in defendant's blood based upon chemical test, which concluded: "Per cent by weight of alcohol in the blood shall be based upon milligrams of alcohol per one hundred milligrams of blood."

Appellant contends the court erred because No. 13 misquoted the applicable statute, "and thereby misdirected the jury * * * as it contained an erroneous statement of the law * * *."

This instruction submits to the jury the provisions of Section 564.442 RSMo 1969, with respect to the effect of chemical analysis as evidence. This case was tried in September, 1971, and the 1969 revision of Section 564.442 was in effect. It provided, in pertinent part, that "Percent by weight of alcohol in the blood shall be based upon milligrams of alcohol per one hundred milliliters of blood."

■ Examination of the quoted portion of Instruction No. 13 shows it to be patently erroneous in its substitution of "milli-

grams" for "milliliters." It was a further misdirection because the State's evidence, through the Breathalyzer, was a measure and reading of alcohol in the blood by volume which properly would be expressed in milliliters and not in milligrams.

Respondent concedes that State v. Corsiglia, 435 S.W.2d 430 (Mo.App.1968), and State v. Carwile, 441 S.W.2d 763 (Mo. App.1969), "have held as reversibly erroneous instructions which misstate the statutory requirements" of Breathalyzer results. In an effort to overcome the prejudicial effect of the misdirection in this case, respondent argues that in those cases intoxication was an essential element of the charge where it was "simply an evidentiary item" or collateral matter in this case.

In this case the State undertook the obligation to prove defendant's intoxication by its information, and such evidence was essential on the issue of culpable negligence. Accordingly, the evidence did not go to a collateral matter and the misdirection of Instruction No. 13 was reversibly erroneous. State v. Corsiglia, supra; State v. Carwile, supra.

Appellant also complains under Rule 27.-20(c), V.A.M.R., of misdirection in Instruction No. 5 where the range of punishment was misstated by overstatement of the statutory minimum punishment. In the punishment section of the instruction, the jury was advised that it could fix punishment:

"3. By a fine fixed by you, but not less than One Thousand Dollars ($1,000.00), or

"4. By a fine fixed by you, but not less than One Hundred Dollars ($100.00), and by confinement in the County Jail for a term fixed by you, but not less than six months."

Section 559.140, RSMo 1969, in the foregoing respects provides that persons convicted of manslaughter "shall be punished * * * by a fine not less than five hundred dollars, or by both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months."

■ Comparison of Instruction No. 5 and the statute shows the instruction to be patently erroneous. State v. McNally, 87 Mo. 644, 658 (1885); State v. Fair, 177 S. W. 355 (Mo.1915). It is not necessary, however, to determine whether this was "plain error" requiring reversal within the meaning of Rule 27.20(c) since the case is to be reversed and remanded because of the reversible error in connection with Instruction No. 13.

Appellant complains also that the State's verdict-directing instruction omits "key words" and thus failed to hypothesize a proper definition of culpable negligence.

■ The instruction defined culpable negligence as "a reckless disregard for human life and safety" which definition comports favorably with the authorities cited in denial of appellant's constitutional attack. In particular, such definition is of the same substance as the "careless or reckless disregard for human life or limb" standard of State v. Cutshall, 430 S.W.2d 173 (Mo.1968), cited by appellant. See also State v. Achter and State v. Millin, supra.

Judgment reversed and cause remanded.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.